18-MJ-6277-MPK

## AFFIDAVIT OF ATF SPECIAL AGENT MATTHEW SHIBLEY

I, Special Agent Matthew Shibley, being sworn, state as follows:

## PURPOSE OF THE AFFIDAVIT

1.      I submit this affidavit in support of an application for the issuance of a warrant to search an Apple iPhone cellular telephone with IMEI number 35568507333030341 ("Target Device"). The Target Device was seized from Jomar VENTURA at the time of his arrest on September 20, 2018, and is believed to belong to and have been used by him for the past six months at least.  As described below, there is probable cause to believe that the Target Device contains evidence related to the violations of the federal firearms and federal controlled substances laws, specifically Dealing in Firearms without a Federal Firearms License in violation of Title 18 U.S.C. § 922(a)(1)(A) and Distribution of a Controlled Substance in violation of Title 21 U.S.C. § 841(a) (collectively referred to as the "Target Offenses"). The Target Device is currently in the custody of ATF.  A complete description of the Target Device to be searched is set forth in Attachment A, which is attached hereto and incorporated herein.

## INTRODUCTION

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  I have been employed as an ATF Special Agent since 2008.  As an ATF Special Agent, I am currently assigned to the Boston Group II Field Office and my duties include the investigation of violations of laws related to firearms trafficking, firearm possession by prohibited persons and the use of firearms in drug trafficking crimes.  I am a graduate of the ATF National Academy and of the Federal Law Enforcement Training Center.

3.     During the course of my law enforcement career, I have written and/or participated in the execution of numerous federal and state search warrants for violations of firearms and narcotics laws.  Based on my training and experience, I have found that individuals who illegally possess or deal firearms and ammunition or distribute controlled substances often receive, take, and maintain photographs of these items with cellular phones or other electronic devices that have a camera function.  These photographs are utilized for a multitude of purposes, which include, but are not limited to: receiving photographs of firearms from potential sellers of firearms; sharing the photographs with potential buyers of firearms in order to solicit their interest in purchasing these items; posting the photographs on social media sites to display the possession of these items to friends and other associates; and sharing of the photographs with rival gang members or enemies for intimidation purposes.  I have also learned through my training and experience, that those individuals who maintain photographs of firearms as indicated above often do not delete them for some time, even after the firearms are purchased or sold.

4.     I have also found, based on my training and experience, that individuals who illegally purchase, possess or deal firearms and ammunition or distribute controlled substances often use their cellular phones in order to communicate with sources of supply, potential buyers or other individuals potentially involved in unlawful business transactions.  These communications often occur in a variety of ways, which include, but are not limited to, e-mail, phone calls and voice messages, text messaging and messaging via social media applications such as "SnapChat" and "Facebook."  Logs and contents of these communications often help identify co-conspirators, reveal the storage location of firearms, ammunition, and narcotics and identify previous transactions.

5.     Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. The Target Device is a type of smartphone. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

6.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in smartphones.

7.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person 'deletes' a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a 'swap' or 'recovery' file.

c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory 'swap' or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or 'cache.' The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

8.  Based on my training and experience, I know that it is a violation of Title 18 of the United States Code, Section 922(a)(1)(a), for any person except a licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce.

9.  Based on my training and experience, I am also aware that it is a violation of Title 21 of the United States Code, Section 841(a)(1), for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

10.  As a result, and as will be discussed below, I submit that there is probable cause to believe that evidence of the Target Offenses, as set forth in Attachment B, will be located within the Target Device to be searched, as described in Attachment A.

11.  The statements contained in this affidavit are based on my own work in this investigation, my training and experience, and information provided by other agents, police officers, and witnesses. Because this affidavit is submitted for the limited purpose of establishing probable cause to believe that evidence of criminal activity involving the Target Offenses is located within the Target Device to be searched, I have not included each and every fact known to me or other law enforcement officers involved in this investigation. Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested search warrant. Facts not set forth herein are not being relied upon in reaching

my conclusion that there is probable cause to support the issuance of the requested search warrant.  Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

## PROBABLE CAUSE

### Use and Reliability of Cooperating Witness;
### Identification of Jomar Ventura as Potential Heroin Trafficker

12.     Since approximately August of 2017, the ATF has been engaged in investigations focusing on narcotics distribution and illegal firearm possessions occurring in and around the Mary Ellen McCormick, Old Colony Avenue, and D Street housing developments in South Boston, MA ("the Developments").  The instant investigation is one of these investigations.

13.     A cooperating witness ("CW") was enlisted to assist in the instant investigation. At the outset of the investigation, the CW was provided with an apartment located at 1 Gavin Way, Apartment #557, South Boston, MA, in the Mary Ellen McCormick Development.  After moving into this apartment, the CW was instructed to identify and become acquainted with individuals in the development and to gather evidence relative to their drug distribution, illegal firearm possession, and/or acts of violence. To date, under ATF's direction, the CW has made multiple controlled purchases of firearms and narcotics.

14.     Over the next few months, the CW was able to develop relationships with numerous individuals who he/she had observed distributing narcotics within the Developments. Based upon the CW's information, ATF Agents were able to identify individuals such as VENTURA, who were involved with the distribution of heroin and fentanyl and the unlawful dealing in firearms.

15.     Specifically, in March 2018, the CW received information regarding a heroin dealer from South Boston named "OSCAR" (later determined to be Jomar VENTURA).  The

CW obtained the cellular phone number 617-840-9167 (hereafter, the "Target Device Mobile Phone Number") for "OSCAR," and was told that he/she could call, introduce himself/herself, and arrange a heroin purchase.

16.     A query of the Target Device Mobile Phone Number was conducted in the Accurint LexisNexis public records search database, which showed the name JOMAR VENTURA, with a listed address of 1262 Columbia Road, Apt 776, South Boston, MA. Additionally, a query of the Target Device Mobile Phone Number was conducted in the Facebook social media website, which showed a Facebook page with the name "JOMAR VENTURA."  A Massachusetts driver's license query for JOMAR VENTURA (DOB xx-xx-1994) was conducted, which showed an active driver's license for JOMAR VENTURA with an address of 1262 Columbia Road, Apt 776, South Boston, MA.

17.     At the direction of ATF, in March 2018, the CW began to make controlled purchases of narcotics from VENTURA, as further described in the Affidavit that I submitted in support of an Application for Criminal Complaint in Case No. 18-MJ-6271-MPK in the District of Massachusetts on September 19, 2018 ("Affidavit").   That Affidavit is incorporated herein by reference and is included in Attachment C.

## **PROBABLE CAUSE**

18.     To demonstrate that there is probable cause that VENTURA committed violations of 21 U.S.C. § 841(a), I refer to and incorporate by reference my prior Affidavit and the Criminal Complaint that issued in Case No. 18-MJ-6271-MPK in the District of Massachusetts on September 19, 2018 (attached as Attachment C).

19.     The paragraphs following demonstrate that additionally that there is probable cause that VENTURA has been engaged in the unlawful dealing in firearms in violation of 18 U.S.C. § 922(a)(1)(a).

**Potential Firearms Transaction Discussed Using Target Device
Around March 28 Controlled Purchase of Heroin/Fentanyl**

20.     During the March 28, 2018 controlled purchase of 9.1 grams of heroin/fentanyl from VENTURA, described in my prior Affidavit, the CW asked VENTURA what other narcotics he had for sale.  VENTURA stated he had cocaine, crack cocaine and marijuana. VENTURA stated he could get the CW guns. VENTURA then showed the CW photographs from his cellular phone of pistols.  VENTURA stated one of his sources of firearms is an individual by the name of "Raymond."  VENTURA stated the price for a pistol would be $600.00 to $700.00.  VENTURA stated a pistol brand new, in the box would be $1,000.00. VENTURA stated he has a second source for firearms.  VENTURA then stated he would bring one of his gun sources to the CI's apartment the following day to discuss a future firearms transaction (although that meeting with the gun source did not ultimately occur).

21.     On March 29, 2018, the CW called VENTURA at the Target Device Mobile Phone Number to continue the conversation they had during the controlled heroin purchase on 3/28/18, where VENTURA agreed to talk to his firearm source for the CW.  During the conversation, the CW asked VENTURA if he had spoken to his firearm source and VENTURA replied yes. VENTURA told the CW he would get pictures of the firearms for sale and text them to the CW (unmonitored call).

22.     At 6:43 pm that day, the CW received a text message picture from VENTURA from the Target Device Mobile Phone Number depicting an individual holding a Bryco-Arms, silver and black colored pistol.  Additionally, at 7:31 pm, the CW received a second text message

picture from VENTURA from the Target Device Mobile Phone Number depicting an individual

with a black colored pistol inside his clothing's waistband.  During a cellular call to VENTURA

at the Target Device Mobile Number that evening, VENTURA told the CW the pictures were of

a 9 millimeter pistol and a .40 caliber pistol (unmonitored call).  On 4/2/18, the CW texted

VENTURA at the Target Device Mobile Phone Number and asked for a price for both firearms.

VENTURA replied "1350" and "with shells."

**Potential Firearms Transaction Discussed During
April 24 Controlled Purchase of Heroin/Fentanyl**

23.     During the April 24, 2018, controlled purchase of 20.39 grams of heroin/fentanyl

from VENTURA, described in my prior Affidavit, the CW and VENTURA again discussed the

possibility of VENTURA selling the CW a firearm.

**Potential Firearms Transaction Discussed Using Target Device
Around May 4 Controlled Purchase of Heroin/Fentanyl**

24.     On May 3, 2018, the CW arranged to purchase 10 grams of heroin/fentanyl from

VENTURA the next day at noon.  VENTURA also agreed to send the CW multiple photographs

via text message of firearms that VENTURA's gun source had for sale. VENTURA told the CW

to choose a gun from the photographs, and then "I'll buy it for you and you can come the next

day or the day after."  Later, still talking about the gun, VENTURA said, "You tell me which one

you want and I'll grab it for you and I'll bring it or you'll come pick it up."  However,

ultimately, the CW and VENTURA agreed that VENTURA would come to the CW's apartment

the next day for the drug deal.

25.     During the May 4, 2018 controlled purchase of 9.81 grams of heroin/fentanyl

from VENTURA, described in my prior Affidavit, VENTURA at one point removed his cellular

phone (what appeared to be the Target device) from his rear pocket, scrolled through it, and then

handed it to the CW.  The CW viewed the photographs of the firearms that VENTURA had

8

previously texted to the CW.  VENTURA and the CW discussed specific features of each firearm and then VENTURA told the CW "two for fourteen hundred" (referring to the price for a black colored firearm and a green colored firearm shown in one of the pictures on the phone). VENTURA continued to describe features of different firearms in the photographs and the CW asked VENTURA to call his source and get some additional prices. VENTURA then sent a text message to his source asking about the prices.  VENTURA read aloud the response from the source that he (the source) wasn't sure and that he couldn't really discuss it.  VENTURA referred back to the picture that showed a black colored firearm and green colored firearm as the "two for fourteen hundred."

26. VENTURA then received a call on his cellular phone, and while VENTURA spoke with the caller in Spanish, the CW began to count aloud the buy money for the heroin/fentanyl. VENTURA ended his call and again stated prices for the different firearms, while scrolling through his pictures.  The CW told VENTURA he/she wanted the two for fourteen hundred (referring to the black and green colored firearms).  VENTURA asked the CW if he planned to sell them (firearms).  The CW replied yes.  VENTURA began counting the buy money that the CW had laid on the kitchen table and then picked the money up.  The CW asked VENTURA how he wanted to do it, referring to the exchange for the firearms.  VENTURA replied that he would get them in two days and sell them to the CW the day after that (although no sale ultimately occurred).  The CW replied okay.  VENTURA stood up and exited the apartment.

### July 13, 2018 Referral to One of Ventura's Gun Sources, Using Target Device

27.     On July 13, 2018, VENTURA contacted the CW via text message from the Target Device Phone Number and indicated that he had a gun source by the name of "J," referring to him as "the guy with the toys."  The CW understood "toys" to mean "guns."  VENTURA

provided the CW a phone number for "J."  The CW contacted "J," who has since been identified as Jermaine TINDAL.  On July 19, 2018, TINDAL illegally possessed and sold a firearm and ammunition to the CW, leading to a separate federal prosecution of TINDAL (18-MJ-2502-MBB).

### Arrest of Jomar Ventura and Seizure of Target Device Incident to Arrest

28.     On September 20, 2018, pursuant to a federal arrest warrant out of the District of Massachusetts (18-MJ-6271-MPK), an arrest team comprised of members from the ATF and Boston Police Department arrested Jomar VENTURA at the intersection of East 9th Street and Mercer Street, South Boston, MA.  VENTURA was in possession of an iPhone – the Target Device – which I seized.

29.     While holding the Target Device seized from Jomar Ventura, I called the Target Device Mobile Phone Number from my government-issued cellular phone.  I viewed that the Target Device began ringing and my government-issued cellular phone number appeared on the screen of the Target Device as the caller.  Inspection of SIM card tray of the Target Device revealed that it bore IMEI number 35568507333030341.

30.     As discussed above, the Target Device is currently being stored at ATF.  From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Target Device first came into ATF agents' possession.

## **CONCLUSION**

31.     I conclude, based on the facts set forth above, that there is probable cause to

believe that evidence of the Target Offenses, as set forth in Attachment B, will be located within

the Target Device to be searched, as described in Attachment A.


I declare that the foregoing is true and correct to the best of my knowledge and belief.


MATTHEW SHIBLEY
SPECIAL AGENT, ATF


Subscribed and sworn to before me this 28th day of September, 2018


HON. M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

## **ATTACHMENT A**

### **Apple iPhone Seized from Jomar VENTURA**

An Apple iPhone with the IMEI number 35568507333030341 located on the SIM card tray of the phone. This cellular telephone was seized from Jomar VENTURA during his arrest on September 20, 2018. The cellphone is located at the ATF Boston office and is secured in the ATF evidence vault. The cellular phone has been labeled an ATF evidence item number of 21 in ATF case xxxxxx-xx-0022.

## ATTACHMENT B

### Items to be Seized

I.   All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 18 U.S.C. § 922(a)(1) and  21 U.S.C. § 841(a)(1), including those related to:

1.   Cellular telephones, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing firearm dealing or drug trafficking and/or referencing individuals engaged in firearm dealing or drug trafficking located in the equipment of the Target Cellphone, including but not limited to:

  a.   Names and contact information that have been programmed into the device (including but not limited to contacts lists) of individuals who may be engaged in firearm dealing or drug trafficking;

  b.   Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device;

  c.   Text messages both sent to and received by the device (including any in draft form) relating to or referencing firearms or drugs and/or referencing individuals engaged in firearm dealing or drug trafficking;

  d.   Incoming and outgoing voice mail messages both to and from the device relating to or referencing firearms, drugs, or individuals engaged in firearm dealing or drug trafficking;

  e.   GPS data;

  f.   Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device (including any in draft form)

relating to or referencing firearms, drugs, or individuals engaged in firearm dealing or drug trafficking;

g.    Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing firearms, drugs, or individuals engaged in firearm dealing or drug trafficking;

h.    All data within the device evidencing ownership, possession, custody, control, or use of the device; and

i.    Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

**Definitions**

For the purpose of this warrant:

A.    "Equipment" means any hardware, software, storage media, and data.

B.    "Hardware" means any electronic device capable of data processing (such as a cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a drive intended for removable storage media); any related communication device (such as a SIM card), and any security device, (such as electronic data security hardware and physical locks and keys).

C.    "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately,

2

inadvertently, or automatically.

D.      "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive or memory card).

E.      "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.      A "record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| JOMAR VENTURA | ) | 18-MJ-6271-MPK |
| | ) | |
| | ) | |
| | ) | |

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of    3/9/18, 3/28/18, 4/24/18, 5/4/18    in the county of    Suffolk    in the
_____ District of    Massachusetts    , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Ct 1: 21 U.S.C. § 841(a)(1) | Distribute and possess with intent to distribute controlled substances |
| Ct 2: 21 U.S.C. § 841(a)(1) | Distribute and possess with intent to distribute controlled substances |
| Ct 3: 21 U.S.C. § 841(a)(1) | Distribute and possess with intent to distribute controlled substances |
| Ct 4: 21 U.S.C. § 841(a)(1) | Distribute and possess with intent to distribute controlled substances |

This criminal complaint is based on these facts:

See attached Affidavit of Special Agent Matthew Shibley.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Matthew Shibley, Special Agent, ATF
_Printed name and title_

Sworn to before me and signed in my presence.

Date:    09/19/2018
_____
_Judge's signature_

City and state:    Boston, MA

Hon. M. Page Kelley, U.S. Magistrate Judge
_Printed name and title_

18-MJ-6271-MPK

## **AFFIDAVIT OF ATF SPECIAL AGENT MATTHEW SHIBLEY**

I, Special Agent Matthew Shibley, being sworn, state as follows:

## **INTRODUCTION**

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF"), where I have been employed for approximately ten years.  I am currently

assigned to the Boston Group II Field Office and my duties include, among other things, the

investigation of violations of laws related to firearms trafficking, firearm possession by

prohibited persons, the use of firearms in drug trafficking crimes, and the investigation of

violations of laws related to explosives violations and incendiary (arson) fires.  I am a graduate

of the ATF National Academy and of the Federal Law Enforcement Training Center.

2.      During the course of my law enforcement career, I have participated in all aspects

of drug investigations, including physical surveillance, surveillance of controlled purchase

transactions, the execution of search warrants, the effecting of arrests, and debriefings of

defendants, informants and witnesses.  I have also reviewed recorded conversations and

telephone, financial, and drug records.  Through my training and experience, I have become

familiar with the manner in which illegal drugs are transported, stored, and distributed, and the

methods of payment for such drugs.

3.      Based on my training and experience, I know that it is a violation of Title 21,

United States Code, Section 841(a)(1) for any person to knowingly or intentionally to

manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or

dispense, a controlled substance.  I am also aware that heroin is listed as a Schedule I controlled

substance and fentanyl is listed as a Schedule II controlled substance, under the drug scheduling guidelines.

4.      I make this affidavit in support of a criminal complaint charging JOMAR VENTURA (DOB xx-xx-1994) with illegally possessing and distributing Schedule I and Schedule II controlled substances in violation of 21 U.S.C. §841(a)(1).

5.      The statements contained in this affidavit are based on my own work in this investigation, my training and experience, and information provided by other agents, police officers, and witnesses.  This affidavit is submitted for the limited purpose of establishing probable cause to believe that VENTURA violated 21 U.S.C. § 841(a)(1).  It therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of the investigation.

### USE AND RELIABILITY OF A COOPERATING WITNESS; IDENTIFICATION OF JOMAR VENTURA AS DRUG DEALER "OSCAR"

6.      Since approximately August of 2017, the ATF has been engaged in investigations focusing on narcotics distribution and illegal firearm possessions occurring in and around the Mary Ellen McCormick, Old Colony Avenue, and D Street housing developments in South Boston, MA ("the Developments").  The instant investigation is one of these investigations.

7.      A cooperating witness ("CW") was enlisted to assist in the instant investigation. At the outset of the investigation, the CW was provided with an apartment located at 1 Gavin Way, Apartment #557, South Boston, MA, in the Mary Ellen McCormick Development.  After moving into this apartment, the CW was instructed to identify and become acquainted with individuals in the development and to gather evidence relative to their drug distribution, illegal firearm possession, and/or acts of violence. To date, under ATF's direction, the CW has made multiple controlled purchases of firearms and narcotics.

8.      Over the next few months, the CW was able to develop relationships with numerous individuals who he/she had observed distributing narcotics within the Developments. Based upon the CW's information, ATF Agents were able to identify individuals such as VENTURA, who were involved with the distribution of heroin and fentanyl and the unlawful dealing in firearms.

9.      Specifically, in March 2018, the CW received information regarding a heroin dealer from South Boston named "OSCAR" (later determined to be Jomar VENTURA).  The CW obtained a cellular phone number (617-840-9167) for "OSCAR," and was told that he/she could call, introduce himself/herself, and arrange a heroin purchase.

10.     A query of cellular phone number (617-840-9167) was conducted in the Accurint LexisNexis public records search database, which showed the name JOMAR VENTURA, with a listed address of 1262 Columbia Road, Apt 776, South Boston, MA. Additionally, a query of cellular phone number (617-840-9167) was conducted in the Facebook social media website, which showed a Facebook page with the name "JOMAR VENTURA."  A Massachusetts driver's license query for JOMAR VENTURA (DOB xx-xx-1994) was conducted, which showed an active driver's license for JOMAR VENTURA with an address of 1262 Columbia Road, Apt 776, South Boston, MA.

11.     At the direction of ATF, in March 2018, the CW began to make controlled purchases of narcotics from VENTURA.  These controlled purchases were conducted using the following standard procedures.  For each of these controlled purchases, fellow investigators and I met with the CW, searched his/her person and vehicle (if used) finding no contraband, equipped the CW with a transmitting device and one or more audio/video recording devices, and provided the CW with government funds for the purchase of evidence.  We then followed the CW to a

3

specific target area to the extent practicable,[1] monitored conversations and transactions the CW

had as they were transmitted over ATF radios, and then followed the CW back to a designated

location for evidence transfer, contraband check, and debriefing.  We then preserved all evidence

as well as all electronic surveillance evidence on compact discs containing the audio/video

recordings of the undercover transactions.

12.     Additionally, ATF Agents were able to secrete a covert audio/video recording

device inside the CW's apartment.  This recording equipment allowed for "real time" monitoring

as video was streamed to a specific website from which investigators are able to record.  Three

controlled purchases were recorded inside the CW's apartment using this equipment, and

VENTURA's offer to sell the CW firearms was recorded using this equipment as well.

13.     In total, between March 2018 and May 2018, the CW made four controlled

purchases of narcotics from VENTURA.  I have received certificates of drug analysis for the

substances purchased by the CW in all of these controlled purchases.  The substances tested

positive for heroin and fentanyl.

14.     Since the start of my dealings with the CW, I have found the CW to be truthful

and reliable, and I have found his/her information to be accurate and often independently

corroborated by other evidence.  The CW has multiple arrests and criminal convictions for

forgery, uttering counterfeit notes, motor vehicle violations, disorderly conduct, impersonation,

and telecommunications fraud.  ATF pays the CW for his/her services, and Homeland Security

Investigations ("HSI") provides a Deferred Action on his/her immigration status.

---

[1] The area within which the CW was operating was very difficult to surveil due to closeness of the community and the difficulty of establishing safe surveillance positions that would not be noticed by area dealers.

**PROBABLE CAUSE**

**March 19, 2018 Purchase of 5.06 Grams of Heroin and Fentanyl from Ventura;
Photo Identification of Ventura**

15.     On March 18, 2018, Special Agent (SA) Keltar Mui and I instructed the CW to

call VENTURA at cellular phone number 617-840-9167 to arrange a heroin purchase from him

for the next day.  VENTURA answered the phone, and agreed to meet the CW the next day at

the CW's undercover apartment to make the sale.

16.     On March 19, 2018, at approximately 2:00 pm, SA Mui and I equipped the CW

with covert electronic recording equipment and provided the CW with $100 of pre-recorded ATF

buy money, which was to be used to make the heroin purchase.  The CW drove his/her vehicle to

the undercover apartment.  The CW contacted VENTURA and told him to come to 1 Gavin

Way, apartment #557.  VENTURA replied that he would be there in 10 to 15 minutes.

17.     Around the designated time, from the apartment window, the CW viewed an

individual whom he/she believed to be VENTURA exiting a black colored Honda Accord.

Shortly thereafter, VENTURA entered the CW's apartment and sat down at the kitchen table.

VENTURA then removed a tightly wrapped plastic baggie and placed it on the kitchen table.

VENTURA said he wanted $1,150 for it and that there was fifteen grams in the plastic baggie.

The CW explained that he/she was confused and that on the phone he/she thought he/she (the

CW) was buying $50 dollars' worth (CW later explained that he/she thought VENTURA said

"50" but he really said "15", meaning 15 grams).  The CW asked VENTURA if he could give

him/her (the CW) a few minutes to get more money. VENTURA replied yes and said that he

lived around here.  The CW then told VENTURA he/she would call him in 15 or 20 minutes.

VENTURA exited the apartment.

18.     SA Mui and I met up with the CW at an undisclosed location.  After some negotiations between the CW and VENTURA via telephone, VENTURA agreed to sell the CW 5 grams of heroin for $400.  The CW was provided with an additional $300 from Agent Cashier funds for him/her to use to make the purchase from VENTURA.

19.     The CW returned to the undercover apartment, called VENTURA and said he/she wanted to make the purchase.  VENTURA replied that he would be there in 10 to 15 minutes.

20.     Video surveillance shows that VENTURA arrived inside the undercover apartment and sat down at the kitchen table.  VENTURA removed a small plastic baggie and placed it on the table.  VENTURA told the CW he paid $325 for it and he would sell it to him/her next time for $375.  The CW counted the $400 aloud and placed it on the table. VENTURA took the buy money from the table while the CW explained that he/she wanted to make more purchases and that he/she (the CW) would call him (VENTURA) in a few days. VENTURA replied ok and exited.  The CW left the plastic baggie of suspected heroin on the table.

21.     SA Michael Romeo traveled to the undercover apartment and took the plastic baggie containing the suspected heroin from the table, searched the CW, and debriefed him/her. SA Romeo showed the CW the Massachusetts driver's license facial photograph, devoid of any identifiers, of VENTURA, and asked the CW if he/she recognized the individual.  The CW replied that the person pictured was the person that had just sold him/her heroin.

22.     I transported the baggie of suspected heroin and the electronic equipment to the ATF office.  The baggie was placed on a digital scale that showed a weight of 5.45 grams.  The baggie was logged in as ATF evidence and stored in the ATF Group II evidence vault.  The baggie was sent to the Massachusetts state drug lab and tested positive for heroin and fentanyl;

the weight of the tested powder was 5.06 grams.  SA Mui and I viewed the video recording and, comparing it to VENTURA's Massachusetts driver's license photo, also determined the seller and VENTURA were one and the same.

### March 28, 2018 Purchase of 9.1 Grams of Heroin/Fentanyl from Ventura

23.     On March 26, 2018, at approximately 4:25 pm, the CW placed a monitored telephone call to VENTURA at phone number 617-840-9167, to arrange for the purchase of a "finger" or ten (10) grams of heroin from him.  VENTURA stated his price for heroin was $75.00 per gram.  VENTURA stated if the CW purchased forty (40) grams or more of heroin, he could give the CW a better price.  The CW stated he/she only needed a "finger" of heroin, to which VENTURA responded with a price of $725.00.  The CW arranged to meet VENTURA the following afternoon; however, on March 27, 2018, VENTURA told the CW he was unavailable.

24.     On March 28, 2018, at approximately 11:00 am, the CW placed a telephone call to VENTURA at cellular phone number 617-840-9167.  VENTURA stated to the CW that he was available to conduct the sale of heroin and agreed to meet around 3:00 pm that day.

25.     On March 28, 2018, at approximately 2:40 pm, SA Mui met with the CW for the purpose of making a controlled purchase of heroin from VENTURA.  The CW placed a monitored telephone call to VENTURA, in which VENTURA stated he would be at the CW's apartment in approximately twenty (20) minutes.  SA Mui then equipped the CW with an audio/video recorder, a transmitter and pre-recorded ATF funds in the amount of $725.00.

26.     At approximately 3:15 pm, the CW entered 1 Gavin Way and proceeded to his/her apartment.  At approximately 3:24 pm, the CW placed a telephone call to VENTURA. During the conversation, VENTURA stated he would be at the CW's apartment in five (5) minutes.

7

27.     At approximately 3:40 pm, agents saw VENTURA exit building 1262 Columbia Road and walk west on Columbia Road in the direction of Old Colony Ave.  A few minutes later, VENTURA entered the CW's apartment, sat down at the kitchen table, and placed a bag of heroin on the table.  VENTURA asked for a scale to weigh the narcotics and said he had to "eye" it when bagging it up.  VENTURA stated the bag might be a little heavy. The CW then exchanged $725.00 in pre-recorded buy money for the narcotics. VENTURA stated the narcotics were stored in his house the previous day.

28.     At approximately 3:50 pm, the CW ended the conversation with VENTURA.  A short time later, agents observed VENTURA walking north on Old Colony Ave in the direction of Columbia Road, and then observed VENTURA return to 1262 Columbia Rd.

29.     On the same day, at approximately 3:55 pm, SA Romeo traveled to the undercover apartment and recovered one (1) plastic bag containing a brown powdery substance. He also searched the CW, and debriefed him/her.

30.     SA Mui and I transported the plastic bag containing the suspected heroin to the ATF Division Office and it weighed approximately 10.7 grams.  The suspected heroin was then placed in the ATF evidence vault and then sent to the Massachusetts State drug laboratory, where it tested positive for heroin and fentanyl.  The weight of the tested powder was 9.1 grams.  The video recording reveals that the seller and VENTURA were one and the same.

### April 24, 2018 Purchase of 20.39 Grams of Heroin/Fentanyl from Ventura

31.     On April 23, 2018, the CW and VENTURA (617-840-9671) exchanged a series of text messages, where VENTURA agreed to sell the CW twenty (20) grams of heroin for $1400 the next day.  On the morning of April 24, VENTURA told the CW via text message that he could make the sale around 2:00 pm and provided the CW the address of "1262 Columbia Road" as the meet location.

32.     On April 24, 2018, I met with the CW, equipped the CW with covert electronic recording equipment, and provided the CW with $1400 of pre-recorded ATF buy money to be used to make the heroin purchase.

33.     At approximately 2:30 pm, the CW parked his/her vehicle in front of building 1262 on Columbia Road.  The CW called VENTURA and told him he/she arrived.  VENTURA told the CW to come inside and go to the third floor.  The CW exited the vehicle and walked inside the building (#1262).  While in the stairwell traveling to the third floor, the CW was met by VENTURA.  VENTURA then led the CW up to the third floor.  The CW and VENTURA stood in the common hallway outside of apartment 776; VENTURA said "my mom's in the house" so they could do the deal "right here."

34.     VENTURA showed the CW a plastic baggie of what the CW believed to be heroin, which VENTURA was holding in his hand.  VENTURA told the CW it was "twenty" (referring to the weight of the baggie in grams) and then explained that the CW was getting it for a good price, "seventy a gram" ($70 a gram).  The CW counted out and handed $1400 to VENTURA.  VENTURA took the money and handed the CW the baggie of the suspected heroin.

35.     The CW and VENTURA discussed the possibility of VENTURA selling the CW a firearm.  The CW then exited down the stairwell with the baggie of heroin and returned to his/her vehicle.  The CW drove his/her vehicle to Gavin Way, parked, and entered his/her undercover apartment.  At approximately 2:49 pm, I entered the CW's undercover apartment and took from the CW one plastic baggie of suspected heroin, which was tied tightly in a knot.  I searched the CW and his/her vehicle for contraband and debriefed the CW.

36.     I transported the baggie of suspected heroin and the electronic equipment to the ATF office.  The baggie was placed on a digital scale that showed a weight of 21.14 grams.  I placed the suspected heroin in the ATF evidence vault and then sent it to the Massachusetts State Drug Laboratory for testing, where it tested positive for heroin and fentanyl.  The weight of the tested powder was 20.39 grams.  I viewed the covert video recording and identified that the seller and VENTURA were one and the same.

### May 4, 2018 Purchase of 9.81 Grams of Heroin/Fentanyl from Ventura

37.     On May 3, 2018, the CW arranged to purchase 10 grams of heroin/fentanyl from VENTURA the next day at noon.  The CW asked VENTURA, "You coming over or you want me to come over?"  VENTURA replied, "I would rather have you come over, but I won't be around until 1 o'clock."   VENTURA also agreed to send the CW multiple photographs via text message of firearms that VENTURA's gun source had for sale. VENTURA told the CW to choose a gun from the photographs, and then "I'll buy it for you and you can come the next day or the day after."  Later, still talking about the gun, VENTURA said, "You tell me which one you want and I'll grab it for you and I'll bring it or you'll come pick it up."  However, ultimately, the CW and VENTURA agreed that VENTURA would come to the CW's apartment the next day for the drug deal.

38.     On May 4, 2018, at approximately 12:00 pm, SA Mui and I met the CW to conduct the controlled heroin/fentanyl purchase from VENTURA.  SA Mui and I provided the CW with $1000 of pre-recorded ATF buy money to make the heroin/fentanyl purchase and equipped the CW with covert electronic recording and monitoring equipment. The CW called VENTURA to confirm the purchase.  VENTURA told the CW he would go to the undercover

10

apartment to make the sale and that he may be bringing someone with him.  The CW replied ok and ended the call.

39.     The CW drove in his/her vehicle to Gavin Way, parked, and entered the undercover apartment.  At approximately 2:30 pm, VENTURA entered the UC apartment and removed a plastic baggie from inside his undershorts.  While holding the plastic baggie, VENTURA sat down at the kitchen table.  VENTURA placed the plastic baggie on the table and the CW asked, "How much is that?"  VENTURA replied "six fifty" ($650).

40.     VENTURA received a call on his cellular phone, and while VENTURA spoke with the caller in Spanish, the CW began to count aloud the buy money.  VENTURA then counted the buy money that the CW had laid on the kitchen table and then picked the money up, stood up, and exited the apartment.  The CW left the plastic baggie of suspected heroin/fentanyl on the table.

41.     SA Romeo traveled to the undercover apartment and took the plastic baggie containing suspected heroin/fentanyl from the table, took the excess buy money, and searched and debriefed the CW.

42.     I transported the baggie of suspected heroin/fentanyl and the electronic equipment to the ATF office.  The baggie was placed on a digital scale that showed a weight of 10 grams.  I placed the suspected heroin in the ATF evidence vault and then sent it to the Massachusetts State Drug Laboratory for testing, where it tested positive for heroin and fentanyl.  The weight of the tested powder was 9.81 grams.  I viewed the video recording and determined the seller and VENTURA were one and the same.

## **CONCLUSION**

43.     Based on the foregoing, I submit that there is probable cause to believe that, on

March 19, 2018, March 28, 2018, April 24, 2018, and May 4, 2018, JOMAR VENTURA did

distribute and possess with intent to distribute Schedule I & Schedule II controlled substances in

violation of Title 21, United States Code, Section 841(a)(1).

I declare that the foregoing is true and correct to the best of my knowledge and belief.

_____
MATTHEW SHIBLEY
SPECIAL AGENT, ATF


Subscribed and sworn to before me this 19th day of September, 2018.


_____
HON. M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS